IIT, an International Investment Trust, et al., Plaintiffs,

v.

VENCAP, LTD., et al., Defendants.

No. 74 Civ. 2504.

United States District Court, S. D. New York.

Nov. 26, 1975.

Anderson, Russell, Kill & Olick, New York City, for plaintiff IIT.

Arthur A. Munisteri, New York City, for defendant Richard C. Pistell.

Curtis, Mallet-Prevost, Colt & Mosle, New York City, for defendants Havens, Wandless, Charles E. Murphy and David Taylor.

## OPINION

STEWART, District Judge:

The Court of Appeals remanded this case to the district court to supplement its findings in support of a preliminary injunction. A supplemental hearing was held; the following constitute the supplemental findings of fact and conclusions of law by this court in support of the preliminary injunction against defendants Vencap, Intervent, Intercapital and Richard C. Pistell ("Pistell").

For a description of the general factual background of this case, see *IIT v.*

*Vencap,* 519 F.2d 1001. (2d Cir. 1975). For this court's prior findings and conclusions to which these findings and conclusions are supplemental, see memorandum decision *IIT v. Vencap,* 74 Civ. 2504 (unpublished, July 3, 1974).

## FINDINGS OF FACT

### 1. THE THREE-PAGE MEMORANDUM

In early July of 1972, Richard Pistell[1] ("Pistell") and Charles Murphy[2] ("Murphy") met in the Bahamas and discussed the terms of the proposed IIT–Vencap transaction. Murphy made handwritten notes of the discussion at that meeting (Ex. 57). Murphy took those notes back to New York with him.

Pistell testified that, at that same meeting with Murphy, Murphy prepared another set of handwritten notes which dealt with the purposes and objectives of Vencap and with the proposed investment by Vencap in Out Island Airways. Pistell stated that he gave the second set of notes to Stanley Graze[3] who "reworked" them, had them typed, and then returned them to Pistell who took them to New York and left them either at the law firm of Havens Wandless or in his home files. Pistell's testimony is not credible to us, and in the absence of any other proof we are unable to find that this sequence of events occurred.[4] We do not find Pistell's version of the foregoing events credible, in part because of his subsequent testimony. Pistell testified that he later requested first that

1. For the convenience of readers, we will reprint in footnotes relevant portions of our prior findings concerning parties to the suit as their names arise and noting by bracketing any change in their status since the time of our previous findings.

Defendant Pistell is a United States citizen who resides in the Bahamas. Pistell is (1) Chairman of the Board of Directors, President and Treasurer of defendant Vencap and beneficial owner of 50% of the ordinary stock of Vencap; (2) President and sole Director of defendant Intervent; (3) owner of 50% of the stock of defendant Intercapital; and (4) owner of 50% of the stock of defendant Conservative Capital.

2. Defendant Murphy, a member of the Bar of the State of New York, is a partner in the defendant Havens Wandless and [was formerly] attorney-in-fact for Pistell. He was a director and secretary of Vencap.

3. Defendant Stanley Graze, who was president of IOS Management Services, Ltd. and Incap, was responsible for the investment management of all the IOS-managed mutual funds.

4. It would have been more credible had Pistell testified that he had given to Graze Murphy's notes concerning IIT's investment into Vencap to "rework" rather than Murphy's notes on the purposes and objectives of Vencap and the Out Island investment.

materials be sent, subsequently that they be telexed, from New York on behalf of Graze who was anxious to get some written information (tr. at 195–6, 200, 208). However, the contents of the Murphy notes allegedly made and given to Graze, according to Pistell, are the same as the materials subsequently telexed from New York. If Graze already had such a memorandum and, in fact, had worked on its language himself, Graze's urgent desire to obtain the information would be difficult to explain.

On or about August 29, 1972, Pistell telephoned Murphy in New York from the Bahamas and requested that Murphy send him certain information. Pistell testified that Murphy agreed to do so. Thus, it is likely that Murphy, at that time, did in fact send Pistell the information requested which was lost at some time either before or after it arrived. In any event, it is now unavailable.

On August 31, Pistell again telephoned the Havens Wandless firm but was unable to reach Murphy or Taylor. He therefore asked someone to send him, by telex, the information he previously requested, but had not received, from Murphy.

On August 31, Pistell received the telex (Ex. 48). We find it most likely that the information which Pistell requested from Murphy was the same information contained in the telex, that the information requested by Pistell was the information sought by Graze, and that the unidentified person at Havens Wandless who sent the telex was merely telexing a copy of that information earlier mailed to Pistell in the Bahamas by Murphy from New York.

We also find that the substance of that telex had been prepared by Murphy in memorandum form in New York at the time he received Pistell's telephone call around August 29. While the telex recounted some terms of the IIT–Vencap transaction as reflected in Murphy's

notes prepared earlier in the Bahamas and taken by Murphy back to New York (Ex. 57), it also contained much additional information, in particular about Vencap, which we find was prepared by Murphy for the first time in New York.

In April of 1973, Pistell testified that "probably . . . Murphy or Taylor wrote [the memorandum]." (Appendix on Appeal at 1350A). In May of 1974, Pistell testified: "I believe Mr. Charles Murphy prepared this memorandum." (Appendix on Appeal at 1815A–1816A).

We also conclude that the portion of the telex which states the earnings of Out Island Airways for a six month period ending in August of 1972 can be used to date the preparation of the contents of the telex at the end of August. While defendants argue that it is as logical to infer that the six month earning statement was a projected one, we disagree. Absent evidence to the contrary, we take the earning statement at face value and conclude that it was prepared at the end of August of 1972.

The telex was typed at the offices of Carson Lawson [5] where it was received (Waddell, tr. at 412) and was then picked up by Pistell.

Although it is unclear what was done with the original three-page memorandum, copies of that document subsequently found their way into the files of Wilkie Farr (D'Alimonte, tr. at 710–11), of Havens Wandless (D'Alimonte, tr. at 858–61; Ex. 72), and of International Capital Investments (Sterling) Ltd., an English company headed by Graze. (Frost, tr. at 119). There is no evidence concerning when or how copies reached those files.

From Pistell's testimony that his request for information contained in the telex was made at the behest of Graze (tr. at 195–6, 200, 208, 223–4) and from Jeremy Waddell's [6] recollection that there was some urgency attached to getting the memorandum typed (tr. at 410),

---

**5.** Carson Lawson is a Bahamian law firm which represented Vencap for part of the IIT–Vencap transaction.

**6.** Jeremy Waddell is a member of the Carson Lawson law firm.

we make the reasonable inference that the information was subsequently provided to Graze in the Bahamas before he left on September 1, an inference which Pistell himself made during the supplemental hearing (tr. at 262).

The Vencap shareholder's resolution, which would appear on the face of the minutes to have been passed on August 31, 1972 and which was incorporated by reference in the three-page memorandum, was not drafted in the final form used in the IIT–Vencap agreement until sometime between September 21, 1972 and September 29, 1972 (tr. at 756–63, 765; Ex. 35A and 60B; Appendix on Appeal at 3965A). (See *infra,* supplemental findings of fact relating to creation of the preference share terms). Therefore, at the time the three-page memorandum was given to Graze, the final version of the Vencap shareholder's resolution could not have been appended to the memorandum, since it had not yet come into existence. Nor is there any evidence that a draft of that resolution was appended to the memorandum as presented to Graze.

Waddell testified that the memorandum was "not a document which was part of the contract between the parties . . . this was something outside that, a document in the nature of a memorandum describing the company and its management and its capital." Waddell further testified that upon receipt of the telex, he made certain deletions because it was his understanding that those terms of the deal had already been agreed upon with D'Alimonte and Pistell during the preceding week, the last week of August. (Waddell, tr. at 396–7).

While we find that some of the terms for a potential investment had been worked out, we also find that a final decision had not been made by Graze on behalf of IIT to make the actual investment in Vencap at the time Graze sought and received the information contained in the telex and the subsequent three-page memorandum.

We find that Graze either relied upon or sought to make it appear that he relied upon that information in his decision to go through with the investment.

## 2. CREATION OF THE PREFERENCE SHARE TERMS

On or about August 28, 1972, Murphy, who was in New York, telephoned Waddell of Carson Lawson, Vencap's Bahamian counsel handling the IIT–Vencap transaction, to advise him that Pistell would be contacting him about a proposed transaction between IIT and Vencap for the purchase by IIT of preference shares in Vencap. Waddell and Murphy did not, however, discuss the specific terms of the preference shares during the telephone conversation (Waddell, tr. at 384–86).

On August 29, 1972, Graze, Pistell and John D'Alimonte [7] met at the Bahamas Commonwealth Bank ("BCB"). Graze told D'Alimonte that IIT was going to acquire some redeemable preference shares of Vencap (D'Alimonte, tr. at 641–46). D'Alimonte prepared handwritten notes at that. meeting (Ex. 60D).

Based upon the information which D'Alimonte obtained at that meeting and subsequently from Graze, D'Alimonte was to prepare on behalf of IIT a purchase agreement between IIT and Vencap (D'Alimonte, tr. at 643–45). D'Alimonte was also told to contact Waddell at Carson Lawson (D'Alimonte, tr. at 643–45, 779–80).

During the period August 29 through September 1, 1972, D'Alimonte remained in the Bahamas (Ex. AE) and drafted the proposed agreement between IIT and Vencap for the acquisition of the preference shares (Ex. 60E). That handwritten draft (Ex. AG), was subsequently typed at the BCB (D'Alimonte, tr. at 721–22, 805–07).

On or about the time of the August 29 meeting at the BCB, Graze gave D'Ali-

---

7. D'Alimonte was an attorney associated with the New York law firm of Wilkie, Farr & Galligher, counsel to IIT.

monte an outline of the proposed terms of the preference shares (D'Alimonte, tr. at 654). That outline was similar to, and perhaps the same with the exception of handwritten notations as, the outline (Ex. 59) received by Waddell (D'Alimonte, tr. at 795–797) from either IIT's lawyers, Wilkie Farr, or from Havens Wandless (Waddell, tr. at 381).

Since D'Alimonte, the Wilkie Farr lawyer who worked on the IIT–Vencap agreement, had not seen the proposed terms until given to him by Graze, we infer that the outline received by Waddell must have come from someone at Havens Wandless. Also, it seems reasonable to infer that the outline was prepared by David Taylor,[8] the Havens Wandless attorney who subsequently worked on those same preference share terms.

On or about August 29, 1972, D'Alimonte met with Waddell in the Bahamas to discuss the terms of the preference shares and the terms of the transaction in general (D'Alimonte, tr. at 659–61, 715, 785; Waddell, tr. at 413–14).

Thereafter Waddell prepared, from the draft we found he had received from Taylor at Havens Wandless, a draft of the terms of the preference shares for the Vencap resolution (Ex. 60A; Waddell, tr. at 419–21). The draft was both prepared and sent to D'Alimonte in the Bahamas (Waddell, tr. at 462–64; D'Alimonte, tr. at 660–61, 665, 716). Later, Waddell sent to D'Alimonte, who was either in New York or in the Bahamas, a draft of the minutes of the shareholders' resolution (Ex. 60C).

D'Alimonte received from Waddell the draft of the preference shares (Ex. 60A), between August 29 and September 1 (Ex. AE). Upon receipt, D'Alimonte and Waddell discussed generally some aspects of the resolution, including D'Alimonte's handwritten comments and notes on the draft (Waddell, tr. at 414–16, 462–3; D'Alimonte, tr. at 697–98, 715–20).

On September 1, 1972, D'Alimonte met with Graze in the Bahamas. D'Alimonte told Graze, who was leaving the Bahamas that day, that he, D'Alimonte, was returning to New York. D'Alimonte stated that he was "taking [the Vencap matter] back to New York and it was still open" (D'Alimonte, tr. at 701).

During the period of August 21 to September 7, 1972, Taylor was away from Havens Wandless on vacation in Spain and in the Canary Islands (D'Alimonte, tr. at 777–8).

On September 21, D'Alimonte, who was in New York, received from Taylor, also in New York, a draft of two paragraphs of the preference shares terms which were delivered by hand (Appendix on Appeal at 3965A). We find that the draft was prepared by Taylor in New York sometime after his return from vacation on September 7, 1972 (Exs. 35A and 60B).

D'Alimonte testified that it was his recollection "absent having recalled [the Taylor] drafts having been presented to [him]" that the Vencap terms were completed in the Bahamas. Nevertheless, D'Alimonte recognized the Taylor draft, written in New York, as containing more than mere mechanical changes. D'Alimonte testified: "I at that point was even surprised to see that stage of the drafting still existing" (D'Alimonte, tr. at 815).

Taylor and D'Alimonte had telephone conversations in New York regarding IIT's investment in Vencap on September 18 and 19, 1972 (tr. at 756–757).

On September 29, D'Alimonte returned to the Bahamas. He met with Taylor there and discussed briefly the Taylor draft of the preference shares provisions.

From all of the above findings and a comparison of the various drafts of the

---

8. Defendant David Taylor is a member of the Bar of the State of New York and is a partner in the defendant Havens Wandless, Stitt & Tighe. He [was an] Assistant Secretary of Vencap and the sole incorporator and Secretary of Intervent. Taylor [was] also a director of Chibex and attorney-in-fact for Pistell.

preference share terms, including the final version used in the IIT–Vencap agreement, we find that those terms as finally used were drafted substantially by Taylor in New York.

### 3. SUPPLEMENTAL FINDINGS CONCERNING PISTELL'S USE OF VENCAP FUNDS

#### a. *The $590,000. Loan Transaction*

On January 1, 1973, Vencap, through its attorney Taylor, deposited $600,000 in Handelskredit Bank (Appendix on Appeal at 3993A).

On January 19, 1973, the directors of Vencap authorized certain officers including Pistell and Taylor to execute any "agreements, promissory notes or other documents" required by Handelskredit Bank in connection with that Bank's loan to Intercapital [9] in an amount not to exceed Vencap's deposit at Handelskredit Bank (Appendix on Appeal at 1641A).

On February 1, 1973, a "trust agreement" was concluded between Vencap "as lender—hereafter called depositor" and the Handelskredit Bank "as trustee—hereafter called Bank" which opened a trust account in the name of Vencap in the amount of $590,000. The agreement provided instructions to grant a loan in the Bank's name to Intercapital "but for account and at the exclusive risk and peril of the Depositor." The bank was to receive a 1.5% per annum "trusteeship-commission" separate and apart from the interest of 8.5% due yearly on the loan which interest was to be credited to Vencap's account (Appendix on Appeal at 1649A).

On February 1, 1973, Handelskredit Bank informed Intercapital that "arrangements [were] being made" to transfer the sum of $590,000. to an intercapital account at the Bank of Commerce in New York "in accordance with the loan agreement dated February 1, 1973, Vencap Limited/Handelskredit-Bank A.G." (Appendix on Appeal at 3994A).

On February 1, 1973, a pledge agreement was entered into between Handelskredit Bank and Intercapital whereby Intercapital pledged and assigned to the Bank 66,256 shares of Pomaikai Oil Corporation stock (Appendix on Appeal at 1645A–1648A), which shares were later replaced by Flag-Redfern shares (Appendix on Appeal at 4002A).

On February 1, 1973, Pistell entered into a pledge agreement with Intercapital for his 66,256 shares of Pomaikai Oil Corporation stock (Appendix on Appeal at 1652A).

On February 1, 1973, Intercapital pledged those Pomaikai shares to Handelskredit Bank in return for what was characterized in the pledge agreement as a "loan" by the Bank to Intercapital (Appendix on Appeal at 1645A–1648A).

Intercapital then lent the $590,000. to Pistell. That loan matures on December 31, 1975 and bears interest at the rate of 9½% per annum.

On March 26, 1973, Vencap and Pistell entered into an agreement, pursuant to the February 1, 1973 pledge agreement between Pistell and Intercapital regarding the Pomaikai shares, in which Pistell granted Vencap an option to purchase 10% of the Pomaikai shares pledged by Pistell to Intercapital (Appendix on Appeal at 1651A–1654A).

Defendants argue that this elaborate arrangement was undertaken for tax purposes. While that may be true, it is evident from the documentary evidence that the loan was one directly from Vencap to Pistell despite its circuitous route.

#### b. *The $55,000. Loan Transaction*

In December of 1973, Pistell borrowed $55,000. of Vencap's funds from Intervent Inc. ("Intervent"), a Delaware corporation, and a wholly-owned subsidiary of Vencap, at 8% interest (Appendix on Appeal at 2146A–2152A). The agreement provided that Pistell would grant Intervent a mortgage on and option to

---

**9.** Intercapital is a Netherland Antilles corporation with offices in Curacao and at 99 Park Avenue, New York, New York. Intercapital has no officers or directors and is owned in equal shares by Pistell and Blackman.

purchase his Bahamian residence, if the loan remained unpaid as of December 31, 1974.

Intervent's letter of confirmation regarding this loan, dated December 28, 1973, was sent from the offices of Intervent in Midland, Texas to Pistell in the Bahamas. Intervent also has a place of business at the offices of Havens Wandless at 99 Park Avenue in New York.

It is likely that plaintiffs can prove at trial that on July 26, 1974, Pistell gave a mortgage on that same Bahamian residence to Murray Malcolm Sinclair for the sum of $150,000. and that Pistell has not repaid that loan (see exhibits C and D, Plaintiffs' order to show cause, dated April 22, 1975).

That mortgage appears substantially to negate Pistell's prior obligation to Vencap through Intervent, and clearly reflects Pistell's intent to use, and his actual use of, Vencap funds for his own personal benefit.

### c. The $100,000. Finder's Fee

Defendant Pistell challenges plaintiffs' allegations that he received excessive compensation from Vencap. Pistell contends that any finding of excessive compensation must take into account the $100,000. finder's fee which he allegedly put into Vencap for start-up costs; Pistell thus claims that the company owed that amount to him.

In November of 1972, Pistell testified that he received a finder's fee of $150,-000. in connection with a transfer of IIT money to Sociedad Agricola y Industrial, San Cristobal ("San Cristobal"). He testified that, out of that fee, $50,000. went to a Mr. Burke for his participation in the transaction (Appendix on Appeal at 3927A). He testified further, however, that the San Cristobal fee was paid directly to Vencap and was deposited into Vencap's account at the Bahamas Commonwealth Bank in the Bahamas (Appendix on Appeal at 3940A).

In April of 1973, Pistell testified in *SEC v. Vesco* that he put the $100,000. finder's fee which he had received into the original Vencap account. He stated

that approximately $25,000. of that amount was his capital contribution for shares, and that the remainder was put into Vencap for start-up costs; Pistell said that he did not deposit the money into the Vencap account as a loan (Appendix on Appeal at 1368A–1369A).

In May of 1974, the following question and answer was recorded at Pistell's deposition.

Q: Do you recall whether the $150,-000. finder's fee you received in the Summer of 1972 in connection with the San Cristobal transaction was paid to Vencap?

A: So we get the record very clear on that . . . that was a fee paid directly to me . . . . and I put my fee that was paid to me . . . into Vencap to help it start up . . ..

Finally, in June of 1974, at the first hearing in the instant case, Pistell testified that the closing of the deal for which he received the $100,000. fee occurred in approximately August of 1972. He testified further that he worked on that deal for two or three months prior to the closing (Appendix on Appeal at 710A).

The accounting records of Vencap, which was formed in June of 1972, do not reflect any loan from Pistell to Vencap during the period from July of 1972 through May 21, 1973.

On May 21, 1973, Walter Blackman became a shareholder, Executive Vice-President and Secretary of Vencap (Appendix on Appeal at 1252A–1253A). On that same day, he proposed to the Vencap Board of Directors, and it accepted, a resolution that the $100,000. be shown as a loan by Pistell to Vencap.

The letter agreement between Vencap and Pistell (as well as the May 21st minutes) reflects the fact that the $150,000. fee was paid directly to Vencap (Appendix on Appeal at 1253A). The agreement requires Pistell to "hold [Vencap] harmless from any liability which may be asserted against the Company for brokerage or finder's fees in connection

with the transaction resulting in the payment of the fee to the Company" (Appendix on Appeal at 4240A).

Under the facts as we have found them to be, we conclude that Plaintiffs do have a likelihood of proving at trial that the fee paid to Vencap was a fee owed to Vencap and not to Pistell personally and that the subsequent Vencap resolution to return that sum to Pistell is a further reflection of Pistell's intent to use Vencap funds for his own personal benefit and is one example of his execution of that intent.

## 4. GRAZE'S KNOWLEDGE CONCERNING PISTELL'S FINANCIAL SITUATION

Pistell has testified at various times about whether he told Graze of his tax problems before Graze made the investment into Vencap on behalf of IIT and whether he told Graze that he would borrow part of that investment to pay those taxes either before the investment was made or before the actual loan transaction.

At the supplemental hearing, Pistell testified that he did not tell Graze prior to the IIT–Vencap closing that he would use the Vencap funds to pay his tax debt.

Pistell testified further that his prior testimony at his deposition in which he had said that he told Graze "he was going to do this deal and borrow this money" (Appendix on Appeal at 708A) referred to the time period prior to the loan and not prior to the IIT–Vencap closing (tr. at 515).

Pistell also testified that he did not remember whether he told Graze about the loan before or after he completed the transaction, but he knew that he had told him.

In April of 1973, at the time closest to the actual events, Pistell testified, in *SEC v. Vesco*, that he did not tell Graze about the loan prior to going through with the loan transaction (tr. at 545–46).

Further, Pistell had said at his deposition that Graze "never really followed anything closely [after the closing of the IIT–Vencap agreement]." (Appendix on Appeal at 709A).

From Pistell's testimony on these various occasions, we find that Pistell did not tell Graze about his loan plan either before the IIT–Vencap closing or before the loan transaction was completed. Rather we find that Pistell told Graze about his loan transaction after the fact. We also find that Pistell's testimony at his deposition that Graze definitely knew about Pistell's tax problem (Appendix on Appeal at 707A) also referred to the time period at which Pistell told Graze about the loan transaction.

We find, therefore, that Pistell had not told Graze about his tax problems either before the IIT–Vencap closing or before the loan transaction.

There is no evidence that Pistell ever told Graze that he owed an approximate $250,000. to Chemical Bank and Franklin National Bank.

We find, therefore, that Graze did not know about Pistell's tax obligations nor about his bank debts prior to the IIT–Vencap closing or prior to the loan transaction.

There is much evidence in the record, including Pistell's own testimony (see e. g., Appendix on Appeal at 708A), that Graze made the investment in Vencap because of the personal reputation of Pistell. It is also apparent from the above findings, however, that Graze did not have much information about Pistell's personal financial situation at the time of the IIT investment.

Further, it is evident from Pistell's own testimony that Graze did not watch Pistell's (or Vencap's) financial situation after the investment. When asked if Graze knew about the terms of Pistell's employment contract with Vencap, which was not executed until May of 1973 (Appendix on Appeal at 1962A), Pistell indicated that he did not, saying that Graze "never really followed anything closely [after the closing of the IIT–Vencap agreement]." (Appendix on Appeal at 709A).

### 5. PISTELL'S INTENT AT THE TIME OF THE IIT–VENCAP TRANSACTION

At the time of the IIT–Vencap transaction, Pistell owed approximately $250,000. to Chemical Bank and to Franklin National Bank and an additional approximate $250,000. in back taxes.

From our previous and supplemental findings that Pistell used a substantial portion of IIT's investment for personal purposes, including personal expenses charged to Vencap as business expenses, an excessive compensation agreement, the $590,000. loan from Vencap and the $55,000. loan from Intervent, we infer that Pistell had the intent to use those funds for personal benefit at the time of the IIT–Vencap closing.

Defendants attempt to negate that inference through evidence that Pistell had other proposed uses for the funds which he had obtained from IIT and through evidence that Pistell had access to other sources through which to pay his debts. As our review of the transactions below reveals, such evidence is insufficient to rebut the inference drawn from clearly ascertained facts.

Thus we find that Pistell did intend to use the IIT investment funds, in substantial part, for his own personal benefit at the time of the IIT investment.

#### a. Potential Investments

##### 1. The Chibex Investment

On August 29, 1972, Vencap entered into a put agreement with FOF Proprietary Funds, Ltd. to purchase 500,000 shares of Chibex Mining Corporation Limited ("Chibex"), at a purchase price of $1.00 per share at any time upon 3 days notice to Vencap (Appendix on Appeal at 1659A).

Defendants argue that this agreement was still active as late as November of 1972, well after the closing of the IIT–Vencap transaction (Ex. AE; D'Alimonte, tr. at 797–801).

Notwithstanding the fact that the Chibex put agreement might have been considered active in the minds of some people in November of 1972, we are concerned here with finding facts which evidence Pistell's intent.

We find that Pistell no longer considered the agreement to be an active possibility at the time of the IIT–Vencap closing. In fact, Pistell testified in April of 1973 that he considered the Chibex deal to be over shortly after August 29, 1972 (Ex. 12). Therefore, Pistell did not have $500,000. of the IIT investment reserved for this investment.

We can thus not find any commitment by Vencap or any intent by Pistell to invest $500,000. of the IIT dollars in Chibex stock at the time of the IIT–Vencap closing.

##### 2. The IRCO Investment

On September 29, 1972, Vencap entered into an option agreement (Ex. 54; Appendix on Appeal at 1373A) to purchase the entire issued and outstanding capital stock of IRCO, a Bahamian corporation and an IOS Holdings Ltd. subsidiary, for a total purchase price of $2,650,000. Under paragraph 3 of the agreement, $700,000. of the purchase price would be paid by Vencap at the closing by either a certified or a cashier's check payable to the order of the seller. The remainder of the purchase price was to be provided in the form of several promissory notes (Appendix on Appeal at 1613A–1625A).

The closing was scheduled for October 16, 1972, with a provision that the closing could be .on "such other date as shall be mutually agreed upon in writing. . . ." (Appendix on Appeal at 1614A).

Pistell deposited $700,000. of the three million dollar IIT investment in a short-term certificate of deposit. The deposit date was October 13, 1972 and the maturity date was October 20, 1972 (Ex. AB), which was four days after the scheduled closing date of the IRCO deal at which time Pistell was obligated to pay $700,000.

There is no evidence that, prior to the October 16, 1972 closing date or, more to

the point, prior to the October 13, 1972 deposit date, any written change in that date was agreed upon between the parties. (See lawyer defendants proposed finding of fact no. 55).

We cannot, therefore, agree with Pistell's statement that those funds were clearly allocated towards the IRCO investment simply because the amount of the segregated funds and the proposed investment happen to be the same. Nor can we find that Pistell intended to invest in IRCO at the time of the IIT–Vencap closing.

### 3. Out Island Investment

In December of 1972, Vencap invested $662,000. in Out Island Airways. In addition, Vencap obtained an option, expiring on May 15, 1972, to purchase an additional 58,000 shares of stock at $15 per share.

Pistell testified that, once having made the initial $662,000. investment, it was necessary to invest a further amount of approximately $870,000. to protect the initial investment by making the airline an operative one.

Pistell testified that the only reason the further investment was never made was because in December of 1972, the Bahamian government proposed to nationalize the airline after the country obtained its independence in July of 1973 (Pistell, tr. at 669A–671A).

To support the claim that Pistell intended to make a substantial investment in Out Island Airways at the time of the IIT–Vencap transaction, defendants cite the three page memorandum which states that such an investment was contemplated for an amount "up to $1,500,000."

We find sufficient evidence to warrant an inference that Pistell intended to make an investment in Out Island Airways at the time of the IIT–Vencap transaction.

We cannot find, however, that Vencap was "committed" to invest $1,500,000. at that time. Further, even with this contemplated investment, there is not suffi-cient other evidence to negate the inference that Pistell intended to use a substantial portion of the IIT investment for his own personal benefit at the time that investment was made.

### b. Potential Funds

In addition to attempting to negate the inference that Pistell intended to use the IIT investment funds for his own personal use through evidence that Pistell had other proposed uses for those funds, defendants also attempt to negate the inference by evidence that Pistell had access to other sources through which he might pay his personal debts.

Our review of the evidence concerning those other sources, however, does not reveal sufficient evidence to negate the inference which we have drawn about Pistell's intent.

### 1. The Orbis Bank Loan

Joseph Williams, an associate of Howard Cerny who was, in 1972, a New York representative of Orbis Bank in Germany, testified at the supplemental hearing. Williams stated that, in the latter part of October 1972, Pistell came to Cerny's office and, in the presence of Williams, informed Cerny that a loan had been arranged for Pistell with Orbis Bank.

At that time, Pistell gave Cerny a memorandum, prepared for Pistell by Taylor, regarding his outstanding bank indebtedness (Ex. 41). Williams understood the proceeds of the Orbis Bank loan would be used to repay that indebtedness (tr. at 64–65). The amount of the proposed Orbis loan was identical to the amount of outstanding bank indebtedness reflected in that memorandum, and was, therefore, clearly arrived at in contemplation of such repayment.

The collateral which secured the Franklin National Bank loan was 66,256 shares of Pomaikai Oil Corporation stock. The Chemical Bank loan was collateralized by a second lien on those same shares. The Orbis Bank loan was also to be collateralized by the same

shares of Pomaikai Oil Corporation stock.

Pistell gave Cerny, at that same meeting, a copy of an announcement to Pomaikai shareholders that a merger had been effected with Flag-Redfern Oil Corporation (Ex. 42).

Pistell's testimony at various times regarding his understanding of this loan has been inconsistent. At his deposition, Pistell stated that the proposed Orbis Bank loan was an attempt to repay his taxes (tr. at 348). Later, he stated that the Orbis loan could have been used either to repay his taxes or to repay his bank debts (tr. at 350). Finally, at the supplemental hearing, Pistell testified that he understood the Orbis loan to have been negotiated in order to pay his bank debts (tr. at 347). Then, when confronted with these inconsistencies, Pistell explained that it did not seem to make a difference which debt the proceeds of the Orbis loan was used to repay since it was his understanding that the tax debts as well as the bank debts had to be repaid before the Orbis loan could be executed.

All parties stipulated that there were no notices of levy from the Internal Revenue Service or the New York State Tax Commission on file at the Chemical Bank or at the Franklin National Bank with respect to Richard Pistell in October or November of 1972. . . . (tr. at 862–3).

Although Pistell explained, at the supplemental hearing, that his lawyer Taylor and his tax accountants were working everything out for him and that he was, therefore, not too clear about where the proceeds of the Orbis loan would be used (tr. at 372–73), we cannot give this testimony much credibility. From Williams' testimony that Pistell himself was involved in the attempt to obtain the Orbis Bank loan, and Williams' notes from the meeting with Pistell and Cerny (Ex. 43), we conclude that Pistell did in fact know to what debt the monies from the Orbis Bank loan were contemplated to be applied.

We find Pistell's statement concerning the Orbis Bank loan made at his deposition, in response to an inquiry about any attempts he made to repay his taxes, to have been false. From this false response and from our further findings below, we infer that Pistell did not have any real possible sources to obtain funds to repay his tax debt of $250,000. Since Pistell said he believed he could not consummate the Orbis loan until he had paid his taxes, and since we find he had no real prospects for paying those taxes, we cannot find that Pistell could have had a very firm belief that the Orbis Bank loan would be consummated.

Under all these circumstances, therefore, we cannot find that the prospects for the Orbis Bank loan negate Pistell's found intent to use a substantial amount of the IIT investment for his own personal use.

2. *Other Sources*

▮ Pistell testified at the supplemental hearing that there were other sources from which he thought he could obtain funds to repay his debts. We have not found Pistell to be a credible witness. His testimony, therefore, where uncorroborated by other witnesses or by documentary evidence, cannot be accorded great weight by this Court. This conclusion is particularly true of any testimony given by Pistell at the supplementary hearing but not testified to on prior occasions where a clear opportunity existed.

We cannot, therefore, take the source of funds he revealed *in camera,* his expressed general belief that any bank in the country would have lent him the money to pay his taxes, or the possibility of a $700,000. finder's fee in connection with his attempts to sell Resort International's interest in Gulf Stream Limited, (Pistell, tr. at 606–607), as sufficiently serious possibilities to negate his found intent to use the IIT investment funds to pay his debts.

Williams testified that during the month of October or November of 1972, he became aware of a possible loan

which the Bahamas Commonwealth Bank was to make to Pistell, probably through the Netherland Antilles Company in which Pistell had an interest (Williams, tr. at 74). Williams thought, but was not sure, that Taylor had informed Williams of this transaction (Ex. 46). The loan, of $250,000., was to be lent first to the Netherland Antilles Company and then, in turn, by the Company to Pistell.

However, at the time of this loan negotiation, Williams testified, the Orbis loan was no longer a possibility (Williams, tr. at 78). The Bahamas Commonwealth Bank loan was thus a "substitute" for the Orbis Bank loan (Williams, tr. at 83). Therefore, the possible Bahamas Commonwealth Bank loan also does not negate Pistell's intent to use a substantial amount of the IIT money to pay, at the very least, his tax debts.

Further, there is not sufficient evidence concerning the Bahamas Commonwealth Bank loan to convince this Court that the loan was ever a real possibility.

## CONCLUSIONS OF LAW

We find probable jurisdiction predicated upon § 22 of the Securities Act of 1933, 15 U.S.C. § 77v(a) and Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa.

■ We conclude that plaintiffs have now shown "sufficiently serious questions going to the merits" of their claim of a violation of Section 10 of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder "to make them a fair ground for litigation." *Sonesta International Hotels Corp. v. Wellington Associates,* 483 F.2d 247, 250 (2d Cir. 1973).[10]

In fact, we find it likely that plaintiffs, at trial, will succeed in proving all the necessary elements of a Rule 10b–5 violation.[11]

1. We conclude that the memorandum furnished to Graze at his request and relied upon by Graze in his decision to invest in Vencap was offered in connection with the purchase of securities and was not simply a memorandum "memorializing" the transaction as alleged by defendants.

2. We conclude that the memorandum exhibits the following omissions or misrepresentations.

a. The memorandum failed to reveal that Pistell had serious financial problems.

b. The memorandum failed to reveal that Pistell intended to use a substantial portion of the IIT funds for his own personal use.

c. The memorandum stated that Vencap was offering "a sophisticated investment program with respect to growth opportunities throughout the world," "the sound investment of preferential capital utilizing management's contacts and experience in growth opportunities," and "a broad investment base"; we find these statements to be false and misleading under all the circumstances.

d. The memorandum failed to reveal that, regardless of Pistell's intent with respect to the Chibex put agreement, Vencap was under an obligation to F.O.F. Proprietary Ltd. ("F.O.F.") for the amount of $500,000. and did not have the funds to meet that obligation if called upon to do so.

■ 3. We conclude that these misstatements and omissions meet the necessary requirement of materiality. *See e. g., Radiation Dynamics, Inc. v. Goldmuntz,* 464 F.2d 876, 887 (2d Cir. 1972).

---

10. We have already found, and the Court of Appeals has affirmed, "a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *IIT v. Vencap,* 519 F.2d at 1019 n. 33.

11. Rule 10b–5(b) makes it unlawful for any person through interstate commerce "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading in connection with the purchase or sale of any security".

The Second Circuit has stated the test of materiality to be "whether a reasonable man would attach importance [to that information] in determining his choice of action in the transaction in question." [12] *List v. Fashion Park, Inc.*, 340 F.2d 457 (2d Cir.) *cert. denied*, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965). *See Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1973); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 384, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).

4. We conclude that the fraudulent acts were performed in the United States, that is the misstatements and omissions were written in the United States and were conveyed to the Bahamas through "use of some means or instrumentality of interstate commerce or of the mails . . . ." *See Kerbs v. Fall River Industries, Inc.*, 502 F.2d 731 (10th Cir. 1974).[13]

5. The investment caused the subsequent financial losses of which plaintiffs complain. *See Mitchell v. Texas Gulf Sulpher Co.*, 446 F.2d 90 (10th Cir. 1971).

Based upon our supplemental findings and conclusions here, we think there is subject matter jurisdiction and at least a fair ground for litigation under what the Court of Appeals denominated as "theory one". We predicate our conclusion upon the premise stated by the Second Circuit that the United States cannot be used as a base for manufacturing fraudulent security devices for export, even when such securities are peddled only to foreigners. We think that the facts with regard to the creation of the three page memorandum now warrant the conclusion that perpetration of the fraudulent acts themselves occurred within the United States; such actions were not "mere preparatory activities or the failure to prevent fraudulent acts" such as appeared to be the case before the supplemental hearing and findings.[14]

In addition to our conclusion of subject matter jurisdiction under Court of Appeals theory one, we believe that jurisdiction exists under "theory four". Under this theory, we have found that, at the time Pistell entered into the IIT–Vencap agreement, he intended to use the IIT funds for his own personal use. Jurisdiction under Rule 10b–5 for what are, given Pistell's intent, material misrepresentations contained in the three-page memorandum can be predicated, therefore, not only upon that memorandum's preparation within the United States, but also upon the subsequent ex-

12. We find that the omission of Pistell's serious financial difficulties is material because IIT's investment in Vencap was made largely in reliance upon Pistell's personal reputation. Pistell has testified that Graze was relying upon Pistell's reputation in making the Vencap investment. Independent of that testimony, we infer from the absence of evidence that Graze had sufficient other information to make a reasonable investment decision, that Graze was in fact relying principally upon Pistell's reputation. Since Pistell knew of that reliance, see *Heit v. Weitzen*, 402 F.2d 909, 914 (2d Cir. 1968), *cert. denied*, 395 U.S. 903, 89 S.Ct. 1740, 23 L.Ed.2d 217 (1969), he also knew that information concerning his financial difficulties, which he has characterized as including a "monumental" tax problem, would be material to Graze "in the sense that a reasonable investor might have considered [it] important in the making of this decision". *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–4, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1973).

13. Plaintiffs have cited us to *Spilker v. Shayne Laboratories*, 520 F.2d 523 (9th Cir. 1975), apparently for the proposition that fulfilling the requirement of use of interstate commerce or the mails is sufficient in itself to confer subject matter jurisdiction on this Court. We do not agree with plaintiffs reading of *Spilker* or its application to the present transnational case. *Spilker* held, in a purely domestic case, that intrastate telephone calls were sufficient to meet the jurisdictional prerequisite of interstate commerce. In contrast, the present case involves the question of whether there was sufficient activity within the United States to invoke the federal securities laws at all.

14. We realize, however, that in order to prevent application of the securities laws "in every instance where something has happened in the United States", *IIT v. Vencap*, 519 F.2d at 1018, there must be a fine line drawn. We recognize that, for this jurisdictional theory, we are perhaps on that borderline.

ecution of that fraudulent intent within the United States.

We have found that the $590,000. loan transaction was consummated by the transfer of funds from the Handelskredit Bank to an Intercapital account at the Bank of Commerce in New York. Pistell, pursuant to a loan agreement with Intercapital, used those Intercapital Funds at the Bank of Commerce to satisfy his bank debts and tax obligations (Appendix on Appeal at 3387A–3389A; 4146A). In addition, we find from the Vencap accounts (Appendix on Appeal at 4118A–4147A) that much of the Vencap monies which plaintiffs allege Pistell misused,[15] were paid out from the Vencap account maintained at the Bank of Commerce in New York (Appendix on Appeal at 2926A–3172A), the city in which Vencap also maintained its transactional records and from which it conducted much of its business.

' We also find that the decisions regarding whether to charge various items on the Vencap general ledger to Vencap as business expenses or to Pistell personally were decisions made in New York. We further find that, at least when questions arose, such decisions were made by Pistell and Taylor and were merely recorded, as dictated, by the accounting firm of Field, Tiger, Krell & Werber. (Tiger, tr. at 121–149). In sum, we find that these and other acts which occurred in New York were "the acts that consummated the fraud". *IIT v. Vencap,* 519 F.2d at 1018.

■ As an alternative to finding that the telex and memorandum contained material omissions and misleading statements, the Court of Appeals suggested, and denominated as "theory two", that the preferred stock issued to IIT might be found to be, by its very nature, "a device, scheme or artifice to defraud" and thus a violation of Rule 10b–5.

In *Popkin v. Bishop,* 464 F.2d 714 (2d Cir. 1972), the Second Circuit declined to expand Rule 10b–5 into a vehicle through which to litigate the "fairness" of securities transactions, but rather determined that an allegation of nondisclosure remained the central focus of federal securities claims. The Court found that

> Section 10(b) of the Exchange Act and Rule 10b–5 are designed principally to impose a duty to disclose and inform rather than to become enmeshed in passing judgments on information elicited.

464 F.2d at 719.[16] We think that the instant case is distinguishable from *Popkin.* Here, an evaluation of the fairness of the transaction is not required for it may be found that the securities offered were, by their very terms, a *per se* fraud.

Stanley Graze was the investment manager for the IIT fund and was, therefore, in a fiduciary capacity with respect to the fundholders. Pistell, a self-proclaimed international financier, knew that the $3,000,000. investment by IIT was not a proper one for Graze to make on behalf of the fundholders.[17]

We think that given the terms of the preference shares, Graze's fiduciary

---

**15.** Allegations which we find plaintiffs are likely to be able to prove at trial.

**16.** *Popkin* has been followed by a number of lower court decisions which, when faced with disputes as to the "fairness" of public corporations "going private", have declined to do so. *See e. g., Greenberg v. Institutional Investor Systems, Inc.,* current C.C.H.Fed.Sec.L.Rep. ¶ 95, 231 (S.D.N.Y.1975), *Dreier v. The Music Makers Group, Inc.,* 1973–74 Transfer Binder, C.C.H.Sec.L.Rep. ¶ 94, 406 (S.D.N.Y.1974), and *Kaufmann v. Lawrence,* 386 F.Supp. 12 (S.D. N.Y.1974), *aff'd per curiam,* 514 F.2d 283 (2d Cir. 1975).

**17.** We note that Pistell also knew:
1. the securities would not "inure primarily to the benefit of the preferential capital investors";
2. the corporate structure of Vencap;
3. his own intentions towards the investment monies;
4. his serious financial problems;
5. Graze had not made proper inquiries about Pistell or Vencap; and knew
6. Pistell had not provided Graze with the information necessary to make a reasonable investment decision.

duty, Pistell's knowledge of Graze's position and his knowledge, in general, of financial matters, it is at least a fair ground for litigation that the securities offered by Vencap to IIT constituted a *per se* fraud in violation of Rule 10b–5(a).

The jurisdictional bases for this theory are 1) the preparation of the memorandum in New York and 2) the creation of the preference share terms in New York.

■ We also conclude that plaintiffs have made a sufficient showing of the existence of a conspiracy between Pistell and the management of IIT to defraud the IIT fundholders so that the conspiracy theory is also a fair ground for litigation (see Court of Appeals theory three).

Evidence of a conspiracy includes our findings that:

1. substantial changes were made in the Vencap shareholder's resolution after the date of that alleged resolution as reflected in the minutes;

2. Graze failed to seek, and Pistell failed to provide, necessary information to Graze in order for him to make a proper investment decision on behalf of IIT;

3. Graze failed to exhibit any subsequent concern about Vencap including the terms of Pistell's employment contract and Pistell's use of the IIT monies;

4. Graze apparently acquiesced in the $590,000. loan to Pistell despite Pistell's earlier representations that Vencap was to be a venture capital company with a broad based investment program;

5. Graze accepted, and perhaps insisted upon, preference share terms which were clearly not beneficial to the IIT fundholders without apparent business reason; and

6. Graze possibly participated in the formulation of those preference share terms.

■ The Court of Appeals fifth suggested theory is that the IIT liquidators could sue derivatively for harm done to IIT as a shareholder of Vencap. The complaint was amended after that opinion to allege such a derivative suit. Plaintiffs have not, however, made any attempt to prove the necessary elements for such a theory.

In order to make such a claim, it is necessary for plaintiffs to show that Vencap was induced to enter into securities transactions, after the time at which plaintiffs became shareholders (see Rule 23.1 of the Federal Rules of Civil Procedure), which meet the requirements of a Rule 10b–5 violation,[18] and which have a sufficient jurisdictional basis in the United States.

The Second Circuit opinion suggests that the Chibex note and option transaction and the purchase of the Lincoln American shares by Vencap might suffice here to meet the standards of a Rule 10b–5 violation as set forth in *Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971).[19]

Since the Second Circuit opinion, the Supreme Court has decided the case of *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). *Blue Chip* held that an offeree who failed to buy stock because of an allegedly fraudulent prospectus had no standing to sue under Section 10(b) and Rule 10b–5 since he was neither a purchaser nor a seller. The Second Circuit has subsequently considered the status of the Birnbaum rule after *Blue Chip*. "We are, accordingly, left with a

---

18. *See Lester v. Preco Industries, Inc.*, 282 F.Supp. 459, 461–2 (S.D.N.Y.1965) (no Rule 10b–5 violation found).

19. The Court expressed uncertainty as to whether the $590,000. loan transaction, now detailed in our supplemental findings, could be characterized as a securities transaction. Based upon our supplemental findings, we conclude that the latter transaction cannot be characterized as such.

reaffirmation of the *Birnbaum* doctrine but with the limitation that the phrase 'in connection with the purchase or sale of any security' may apply to a security different from the security whose sale *originated* the fraudulent scheme." *Frigitemp Corp. v. Financial Dynamics Fund, Inc.,* 524 F.2d 275, 280–281 (2d Cir. 1975). These new developments do not affect the instant case, however, since in both the Chibex and Lincoln American transactions, Vencap meets the purchaser-seller requirements of *Birnbaum.*

■ Turning to the Chibex transaction, we find no actionable violation of Rule 10b–5.

On or about August 29, 1972, Pistell caused Vencap to enter into a transaction which gave F.O.F. Proprietary Funds Ltd. the right, upon three days written notice, to require Vencap to purchase 500,000 shares of Chibex Mining Corporation ("Chibex") stock at a purchase price of $1.00 per share (Appendix on Appeal at 1659A). There was no time limitation placed in the agreement.

At the time Pistell caused Vencap to enter into that transaction, Vencap did not have sufficient funds to meet such a put.

Pistell has testified that his "main interest" was in Chibex. Pistell is president and chairman of the board of Chibex (Appendix on Appeal at 1281A). In addition, Pistell owns 50% of Conservative Capital which, in turn, owns 2,000,-000 of the 3,700,000 outstanding shares of Chibex (Appendix on Appeals at 952A). Blackman, who on May 22, 1972 became the 50% owner of the common stock of Vencap, owns the other 50% interest in Conservative Capital (Appendix on Appeal at 953A).

On or about July 31, 1973, Vencap loaned Conservative Capital a sum of $75,000. That loan was to repaid by December 31, 1979 with interest at the rate of 5% per annum (Appendix on Appeal at 1974A). Neither Pistell's nor Blackman's interest in Conservative Capital was disclosed to the Vencap Board of Directors at the time. (Taylor, Appendix on Appeal at 643A; Plaintiffs' Ex. 11, Appendix on Appeals at 1240A).

The Vencap Articles of Association provide that if a proposal is made for a transaction with a company in which a Vencap officer or director has an interest, the nature of that interest must be disclosed at the meeting at which the proposal is acted upon (Appendix on Appeal at 1211A–1212A).

On November 25, 1973, Conservative Capital granted Intercapital an option, expiring on August 1, 1977, to purchase 75,000 Chibex shares at $1.00 per share. It granted an option to purchase 75,000 additional shares at $1.50 per share conditioned upon Intercapital making or arranging for an additional $75,000. loan to Conservative Capital on or before August 1, 1974 (Appendix on Appeal at 3366A).

At two undisclosed times, Vencap, through Intercapital, lent Chibex the sums of $400,000. and $80,000. (Taylor, Appendix on Appeal at 645A–647A). Taylor testified that the $80,000. was repaid. Since there is no contrary evidence, we find that it was repaid. We make no finding concerning repayment of the $400,000., since we have been presented with no evidence whatsoever concerning its repayment.

The Chibex put agreement which was entered into before IIT's investment into Vencap cannot be the basis of a derivative action, since IIT was not a shareholder of Vencap at the time of the agreement. (Rule 23.1 of the Federal Rules of Civil Procedure). Therefore, plaintiffs' only possible complaint about this agreement must arise from the failure of Vencap to disclose it in the three page memorandum. We have already discussed this theory. (See supra at p. 1106–1107).

As for the remainder of the transactions discussed above, we need not reach the merits of a 10b–5 violation since we have no evidence that any activities in connection with these transactions occurred within the United States.

■ Finally, turning to the purchase by Vencap of shares of Lincoln Ameri-

can Corporation, we cannot conclude that preliminary injunctive relief would be warranted on the basis of those purchases. We have been shown no evidence, nor in fact given any arguments by plaintiffs' counsel, in support of the proposition that these stock transactions were entered into for the personal benefit of Pistell.

Pistell testified that in 1972, he became chairman of the Executive, Committee of Lincoln American Corporation, formerly called Cobourn Corporation (Appendix on Appeal at 703A; 737A–738A). In that year, Pistell testified, the company had a consolidated net loss of $3,792,227. The following year, 1973, the company had a reported profit of $692,000.

Pistell testified further that, upon relocating to the Bahamas to operate Vencap, he resigned his position as Chairman of Lincoln American Corporation and gave up a stock option for 100,000 shares, presumably in Lincoln American Corporation (Appendix on Appeal at 703A).

Subsequently, Vencap made substantial investments into Lincoln American Corporation, the shares of which are traded on the American Stock Exchange (Appendix on Appeal at 1768A). (See also Pistell's testimony regarding the Benhima shares, Appendix on Appeal at 1855A–1859A).

While such trading on the American Stock Exchange would be a sufficient jurisdictional basis, we have no evidence that Pistell caused Vencap to enter into these transactions for Pistell's own benefit. Absent such evidence, we can find no evidence of a 10b–5 violation, despite the existence of a substantial unrealized loss by Vencap on those investments.

In sum, we conclude that there has been a sufficient showing of subject matter jurisdiction and of a Rule 10b–5 violation (under Court of Appeals theories one, two, three and four) to warrant

preliminary injunctive relief for plaintiffs against defendants Vencap, Intervent, Intercapital and Pistell.

In addition to the jurisdictional bases under the securities laws, plaintiffs have argued for the first time upon remand that there is jurisdiction over this case based upon the theory of ancillary jurisdiction articulated in *Esbitt v. Dutch-American Mercantile Corp.,* 335 F.2d 141 (2d Cir. 1964).

Plaintiff in *Esbitt* was a receiver who had previously been appointed by the same district court in an earlier action brought by the Securities and Exchange Commission for injunctive relief and for the appointment of a receiver. The *Esbitt* court held that where the court which had appointed the receiver heard the subsequent case brought by the receiver, and the aims of that suit were consonant with the goals sought to be obtained through the appointment, there was no need for an independent basis of jurisdiction since that case was ancillary to the earlier action. *Accord Tcherepnin v. Franz,* 485 F.2d 1251, 1255–56 (7th Cir. 1973). *Cf. ICC v. Vesco,* 490 F.2d 1334, 1350 fn. 21 (2d Cir. 1974).[20]

Recently, the Second Circuit was confronted with the issue of whether ancillary jurisdiction should attach where a receiver is appointed in a jurisdiction other than the one in which the suit is brought. *United States v. Franklin National Bank,* 512 F.2d 245 (2d Cir. 1975). In *Franklin National Bank,* the Second Circuit refused to allow a receiver appointed in the Southern District of New York to rely upon the theory of ancillary jurisdiction in a suit brought in the Eastern District of New York. The Court held that the receiver must establish independent jurisdictional grounds.

The rationale behind ancillary jurisdiction as found in *Esbitt* and *Franklin National Bank* is that "[t]he ancillary suit is cognizable in the court

---

**20.** In *ICC v. Vesco,* the Second Circuit declined to decide whether court appointed special counsel and board of directors was the theoretical equivalent of a receiver for ancillary jurisdiction.

of the main suit regardless of the citizenship of the parties or the amount in controversy because the res over which the receiver took control is already before the court." *United States v. Franklin National Bank,* 512 F.2d at 249. It is this rationale which we believe bars such a jurisdictional basis in the instant case.

Although a consent order was entered in this court in *SEC v. Vesco* on April 4, 1974 (Ex. 74) which provided for the appointment of a special receiver, that receiver was to work with the *Luxembourg* appointed liquidators of IIT "in connection with the recovery and realization of the [IIT] assets". That order also provided that all assets of IIT held in the United States "shall forthwith be turned over directly to the liquidators". We do not believe that this consent order can be deemed equivalent to the court's appointment of a receiver so as to bring the assets of IIT, "the res", before this court. Ancillary jurisdiction is not, therefore, appropriate in this case.

We turn now to defendants Havens Wandless, Charles Murphy and David Taylor ("the lawyer defendants") who argue that the complaint against them should be dismissed for lack of subject matter jurisdiction.

On June 10, 1974, this Court entered a temporary restraining order which enjoined the lawyer defendants, among other defendants, from certain activities with regard to the assets of IIT, Vencap, Intervent and Intercapital. On June 14, 1974, that order was modified, at the behest of plaintiffs' counsel, to eliminate the lawyer defendants. After the preliminary injunction was entered against other defendants, the case was appealed to the Second Circuit,[21] which returned the case to us for supplemental findings on the preliminary injunction. At that time, plaintiffs moved to amend the complaint in various respects. One such proposed amendment was to assert temporary and injunctive relief against the lawyer defendants. That proposed amendment was opposed by the lawyer defendants on the ground that plaintiffs had withdrawn that part of the complaint in June of 1974 before any of the proceedings on the preliminary injunction had taken place. We agree with the lawyer defendants on that aspect of plaintiffs' motion.

> Since plaintiffs withdrew their request for temporary relief and never sought preliminary relief against these defendants, we do not think that plaintiffs may now seek such relief in the supplementary proceeding ordered by the Court of Appeals.

Memorandum decision, July 8, 1975.

We granted, therefore, defendants' request to strike that portion of the proposed amended complaint.

Plaintiffs now take the position that the question of subject matter jurisdiction over the lawyer defendants and the issue of those defendants' intent in performing various activities is not before the court at this juncture. We agree. While we also agree with defendants argument that it would be equitable to make a determination of jurisdiction concerning these defendants as quickly as possible, we cannot overlook plaintiffs' position that it has not had an opportunity to make its case against the lawyer defendants.

We also note that, upon remand of this case from the Court of Appeals, all parties agreed to proceed with a supplemental hearing on the preliminary injunction then in effect rather than consolidating such a hearing with the trial on the merits.[22]

The above opinion constitutes my supplemental findings of fact and conclu-

---

21. Plaintiffs on appeal apparently took the position that the lawyer defendants were not properly before the appellate court. The Second Circuit declined to decide the question. *IIT v. Vencap,* 519 F.2d 1019 n. 35.

22. Consolidation was suggested as a possibility by the Court of Appeals in the decision remanding the case and was, therefore, considered by the parties and by the Court.

sions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

So ordered.